CHILDRESS v. TYSON.

4-6016                                    143 S. W. 2d 45

Opinion delivered July 8, 1940.

*Edgar Webster,* for appellant.

*A. M. Bradford* and *Marvin B. Norfleet,* for appellee.

BAKER, J.  H. P. Childress who may be referred to by name or as appellant, or plaintiff, sued the Tysons who may be referred to by name or as appellees, or defendants, in the circuit court of St. Francis county, upon a certain promissory note seeking to take judgment for $1,250, the amount of said note with interest.  This note was given for part of the purchase price of twenty-three mules, a saddle horse, 1,000 bushels of corn and a considerable quantity of farming tools or implements.  When the pleadings were finally made up the defendants were seeking to recover from the plaintiff, by way of recoupment or counter-claims, or off-sets, certain amounts of money arising out of alleged false representations

as to acreage of the farm they had rented from the plaintiff; also a certain amount on account of the fact that some of the mules were not of the quality represented, but were alleged to have been worthless for farming purposes and further that they had been induced to execute the lease contract by further false promises and representations as to repairs to be made upon the farm, causing certain alleged losses, which the said defendants assert they sustained by reason thereof. The final prayer of the defendants was for the cancellation of the lease contract on account of the alleged fraud or deceit and the cancellation of the notes given for rents for the years of 1938 and 1939, the said defendants having occupied the place during the year 1937 and having paid the rent thereon for that year in the sum of $4,500 as contracted.

By consent of the parties there was a transfer of the case from the circuit court to the chancery court, where a decree was rendered for the plaintiff for the note with interest and recoveries were had by the defendants on account of the alleged shortage in acreage of the farm and on account of the failure on the part of plaintiff to make repairs. The damages have been assessed on that account in such sums as were found by the court to have been spent by the defendants, cross-complainants, for extra labor required by reason of deficient housing upon the farm, occasioned by lack of repair, for the cancellation of the lease contract and notes and other recoveries in such an aggregate amount as exceeded the recovery by the plaintiff. The court denied the right of the defendants to recover any amount on account of the alleged defects of five of the mules as sued for.

The plaintiff has appealed from all the recoveries against him and the defendants have cross-appealed from that portion of the decree denying them a right to recover on account of the loss which they alleged arose by reason of the deceit and false representations or warranties, in regard to the mules bought by them from the plaintiff. In the trial of all these issues a very large

record has been compiled. The testimony in many instances is in irreconcilable conflict and the facts must be determined upon a basis of considering, as we have, what we deem to be the preponderance of this proof. We do not think that it would be of any particular advantage to take up and discuss or comment on all the controverted items merely to settle disputed questions of fact, which are of no possible interest except to the parties involved. Should we attempt such a course, this opinion would be inexcusably long. We shall content ourselves, therefore, with statements of fact as we have determined them and with our conclusions as we are thus impelled to make them. The court decreed the right to recover upon the face of the note sued on, with interest, but held that the defendants were entitled to counter-claim, first, on account of an alleged shortage in the acreage. The defendants having alleged in their complaint that they were induced to sign the contract by reason of representations made by Mr. Childress to the effect that the farm had 600 acres of land in cultivation; that although they had looked over the land to some extent they had accepted his statement in that regard and because of their belief therein had signed the contract which they would not have otherwise done had he not so represented and had they not believed the statements made. This testimony was not given in an effort to contradict the written contract, but in explanation of the inducing reason or cause for its execution by the defendants. The contract contained a clause orally discussed by the parties, and in the briefs, as the "over-flow clause," which provided among other things that in the event of an overflow to such an extent that crops could not be planted before July 1st, and if such crops planted thereafter did not make an average crop, on account of the lateness of the season, that for such overflowed territory as was not so planted and did not so produce the lessees would have a right to a reduction for such overflowed acreage at the rate of $7.50 per acre. It was the argument and contention of the appellees that this amount so fixed by the agreement was the average

price of the rental upon the lands under the lease and this average price figured by the 600 acres fixed an annual rental of $4,500, for which notes were given for the years 1937, 1938 and 1939. It was not contended that there was any lost acreage on account of the overflow, but that the acreage as represented or stated by the lessor did not exist. Before the trial of the case there was an actual survey. The surveyor determined that there were 514.5 acres. The County Agricultural Agent was called as a witness and his testimony was to the effect that a survey had been made by aerial photographs of the area and an instrument called a "planimeter," which showed 528 "crop acres"; that on account of Government regulations C. F. Tyson, Jr., had on April 13, 1937, signed in his office a statement showing that there were 528 "crop acres," as this area was designated. This acreage became, therefore, the basis upon which the lands were farmed and cultivated in their relation to the governmental agencies, within which the farm may be found. The court accepted this 528 acres as the acreage established by the proof and rendered a decree thereon having first found that the lessees were induced to sign the contract by fraud and deceit on the part of the plaintiff. Without any attempt to gather together the voluminous testimony upon this point, we agree with the chancellor for the reason that under the contradictory testimony offered we are unable to say that his conclusion as to the inducing cause for the execution of the contract was against the preponderance of the evidence. But we are inclined to think that the chancellor's finding in regard to the number of acres of crop land was not correct particularly, in the light of the facts and circumstances and conduct of the lessee, Tyson, Jr., who knew before he had planted the crop that the acreage as shown in the county agent's office was that amount. In addition to this amount of acreage, however, in cultivation, some other land which had been devoted to pasture and a cow lot was ploughed up and put in cultivation, adding thereby sixteen acres to the 528 acres, making a total of 544 acres. As to this additional 16 acres the facts appear

undisputed. With this slight correction of the chancellor's holding, his determination upon this point is upheld and the defendants were properly permitted to recover upon their cross-complaint at the rate of $7.50 per acre for this difference between the actual 544 and 600, or 56 acres at the rate sued for, $7.50-$420.

We do not attempt to state the next matters in the order in which they have been presented, as we find it may be more clearly set forth by presenting the contention made by the lessees that the plaintiff made a fraudulent promise to the effect that he would make necessary repairs. It is the contention of the appellees upon that point that this was not a covenant to repair or an oral promise amounting to such, but that it was a fraudulent promise inducing the execution of the contract and made by Childress with no intention to perform it. The court did not sustain this contention and after a careful reading and consideration of this entire record, we are convinced he committed error only in declaring the law. We state in a manner as concise as we are able some of the reasons why we think this part of the decree was wrong. At the time of the execution of this contract there had been no flood and a preponderance of the proof shows, we think, that the buildings or tenant houses upon the property were in reasonable or fair condition; but as stated by Mr. Childress, repairs upon farm property is a constant process and must be followed up year by year to keep the properties in suitable condition for housing tenants. Moreover, the parties did have in mind, at the time of the execution of this lease contract, that there might be an overflow and for that reason inserted the "flood clause" above mentioned in the contract.

A flood did come and all tenants had to leave the farm, but when the flood waters subsided they returned thereto and it was found at that time that fourteen of the tenant houses were in a pretty bad condition. Blocks had been washed from under them, some of the porches had been broken off or washed away and in some instances parts of the flooring were gone. The lease con-

tract itself contained no provision that the lessor would make repairs, but Mr. Childress concedes that it was his intention, and he now admits that he had stated that he would make such repairs as he found necessary and had given to his lessees a written statement to that effect which they refused to accept as an amendment to the contract as it was not an obligation, as they determined it, to make repairs as fully as might be needed.

While the land was still under the overflow, Mr. Tyson, Sr., and Mr. Childress met upon a train between Memphis and Marianna and Mr. Tyson was given authority by Mr. Childress to purchase lumber to be moved and shipped upon the farm for repairs as soon as the overflow subsided, and, in accordance with this authority and on account thereof, Mr. Tyson went to the lumber yard of Vaccaro-Grobmyer Company and ordered the lumber, amounting in. the aggregate to $164 and the lumber was shipped and delivered to the farm for repair purposes. As soon as the water had sufficiently subsided and before the ground was ready for cultivation, Mr. Tyson had, under the directions of Mr. Childress, seen Mr. Patton, who had been employed upon the farm for some time prior thereto, as a carpenter and Mr. Patton was put to work making repairs under the direction of Mr. Tyson, Sr., or Mr. Tyson, Jr. Mr. Tyson who asked that this lumber be shipped testified that he advised the lumber company that the lumber was bought for and should be shipped and charged to Mr. Childress. Mr. Childress admitted his liability therefor. The Tysons, however, sued for the recovery of the purchase price of this lumber, though they had not paid for it and they were permitted to recover against Mr. Childress the $164. We think the mere statement of these facts make the error of that part of the recovery against Mr. Childress manifest. We do not state any further facts or make any further comment thereon, for the reason that in the oral argument presented, in addition to the voluminous briefs in this case, it was practically conceded that the Tysons had no right to recover for the debt for the lumber. That part of the decree permitting

recovery for the $164 by the Tysons as against Childress must be reversed.

The foregoing statement, we think, makes it apparent that the Tysons were wrong in alleging a deceptive promise made with no intention to perform. There is no doubt that repairs were going on constantly upon the property and that although the houses were in bad condition on account of the flood repairs continued to be made until sometime in August, when Mr. Patton who had been working there left and went to Mississippi. But according to the undisputed testimony, Woody Dark who had been working with Patton continued this repair work and was, part of the time, at least, assisted by a man named Stimson.

Although the Tysons say that no substantial repairs were made, Woody Dark testified that he and Stimson worked together, after Patton left, upon the property making repairs, using the lumber that had been shipped for which the $164 debt was contracted; that in September they applied to Mr. Tyson, Jr., and advised him that they had completed in a substantial manner the repairs to be made and asked if he desired other work to be done and if so what they should do. Dark testified most positively that it was his desire to continue in this work as he had no other job or employment, but says that he was advised by Mr. Tyson that he did not desire any other work done at that time by way of labor upon the farm. The only denial of this testimony is to the effect, as made by the Tysons, when they testified later, that there were in fact no substantial repairs made, and Mr. Tyson, Sr., says, as a clinching argument or conclusion, that it would have cost at that time $1,500 to put all the houses in good condition. This statement, perhaps, did not take on even the substance of an intentionally fair estimate, but it is evident from the proof itself, in the manner in which it was given, that Mr. Tyson was attempting more to be convincing of the fact that substantial repairs had not been made than he was to be accurate as to the amount necessary to complete the work begun by Mr. Patton when Mr. Tyson,

■■■■■■■

Sr., had bought the lumber for repairs. This is evident from another bit of evidence that comes from the fact that during the next year, 1938, when the new tenant had occupied the property, repairs were made; and by the new tenant, it was estimated that the labor therefor cost between $200 and $300. The Tysons seek to avoid the effect of this testimony by saying those repairs made at that time were merely temporary; that may be true, but even though temporary, if they corrected the evils that existed, the lessees, or their tenants, had no right to expect more as they were not permanently located upon the property, but were there under a lease or contract which had been not more than two years to run. The error arising out of this evidence, the effect of which is stated above, was on account of the contention of the lessees that the tenant houses were in such bad condition that they could not house comfortably labor necessary to cultivate the farm; that tenants were not satisfied, were not comfortable during the cold weather, that the houses leaked and that when weather was warmer mosquitoes were bad and they were constantly moving about from house to house. This evidence is met with a rather forceful contradiction in that many if not all the tenants testified, and the general effect of their testimony was that although some repairs had been made they understood the conditions under which they were having to live and they were not making trouble for the appellees. It was shown only about four of the occupants of these houses left during the crop season and an explanation was made for the absence of each one of the four. One of them wanted to go to town, for instance, to get a Government check due him and he was told by Mr. Tyson if he went at that time not to come back. He accepted Mr. Tyson's order and did not return. Another believed that Mr. Tyson, according to his statement, was intending to have some of the other laborers whip or beat him and on account of his desire to avoid this difficulty left the place. In fact, not a single tenant was brought upon the stand who left during the farming season or gathering season

by reason of the inadequacy of the house he occupied. The appellees offered proof, which is undisputed to the effect that they took their trucks, went to nearby villages or towns, brought out laborers to chop cotton and also to pick cotton. This alleged labor shortage for cotton choppers and cotton pickers they attributed, in their testimony, to the poor housing accommodations upon the farm, as they stated that no substantial repairs were made upon the houses so that such laborers could be housed or kept there. They asked for a recovery and the court gave it to them on account of this expense in bringing in this additional labor $410, and this was held to be the direct result of the ''breach of the oral agreement to repair fully.''

Not only was this erroneous in respect to the findings of fact made by the trial court, but it was erroneous in the declaration of law as the measure of damages for the alleged breach of the contract to repair.

The trial court in deciding this phase of the case held that there was ''a breach of an oral contract to repair fully.'' It was upon this finding of fact that the court permitted a recovery for expense of transporting labor.

Whatever may have been the seeming connection between inadequate housing conditions and the scarcity of labor, the factual matters determined by the court are not supported by this record. There is proof to the effect that it is usual for such plantations to supply seasonal demands for labor by transporting cotton choppers and cotton pickers. While this may not be a condition that would justify judicial recognition, it is a matter too well known to permit serious dispute or controversy that there are seasonal demands for labor on plantations in eastern Arkansas, and it may be wherever large cotton crops are grown, and it requires little proof to convince anyone acquainted with conditions that cotton choppers and cotton pickers are not only frequently, if not always, supplied to meet these seasonal labor demands.

Besides these factual matters just stated the court was in error in the declaration of the remedy, even if

there were substantial evidence to the effect that there was a "breach of an oral contract to repair fully." This question treated upon the assumption that there was an agreement to repair was one that was within the hands or control of the appellees inasmuch as it was their duty to lessen or minimize as much as possible any damages that might have accrued by reason of the breach of such agreement. So if the landlord agreed to repair and failed to do so, the tenants or lessees had the right to make necessary repairs as required, and to charge the landlord therefor. The rule has been announced that the measure of damages arising out of such failure on the part of the landlord to perform his contract is what it would have cost the tenant or lessee to make these repairs, instead of a speculative loss that might have arisen indirectly by reason of the breach. Numerous authorities may be cited supporting the above announcement. We present only a few. *Plunkett* v. *Meredith,* 72 Ark. 3, 77 S. W. 600; *Johnson* v. *Inman,* 134 Ark. 345, 203 S. W. 836; *Bowling* v. *Carroll,* 122 Ark. 23, 182 S. W. 514; *Varner* v. *Rice,* 39 Ark. 344.

The exception to this rule announced and supported by the authorities cited arises out of a condition wherein the expense of repairs is large or heavy so as to make impracticable the requirement of the tenant to perform this service at the expense of the landlord. In such cases, it has been held that the tenant may recoup and be compensated for such damages as may be suffered by reason of the breach, by having adjudged to him a reduction in the amount of rentals that the landlord will receive for the property in its dilapidated or impaired state or condition. *Johnson* v. *Inman, supra.*

If there is any other rule applicable to the state of facts above cited, counsel have cited no authorities announcing the same. It must be clearly apparent that indirect losses for such a breach of the contract to repair cannot follow as is contended for by the appellees.

The next proposition for which a recovery was permitted by the appellees against the appellant was the recovery for the sum of $412.50 for the alleged expenses

of the moving of Charles Tyson, Jr., from the Rawlison place in St. Francis county to the farm of his uncle in Mississippi county, a distance of about sixty-five miles. We state only a few facts in connection with this before mentioning our conclusions. Mr. Tyson, Sr., had given notice that the property would be vacated unless required repairs were made January 1st. Mr. Childress in response to this demand advised that such repairs would be made as was necessary as soon as laborers could be had therefor. It did not occur to the appellees that they could have made these repairs and have charged the expenses thereof to the appellant. After they had gathered their crops, some weeks after the first of the year, the property was vacated and Tyson, Jr., moved to Mississippi county as above stated. His charge for the moving, if permissible at all, was perhaps not unreasonable, but upon the same theory, if he had moved to California it would perhaps have taken the value of the farm to pay the expense thereof.

We think it will reasonably appear from the foregoing statements that the appellees wrongfully vacated the property and moved away. They were not evicted and on that account may not recover for any alleged damages by reason of their own error in wrongfully vacating the property. Hence, the recovery for the expense of this moving must be set aside. This last announcement to the effect that the appellees breached the contract and wrongfully vacated will not in this particular case justify a recovery on the part of the appellant for any loss that may have accrued to him by reason of having to rent or lease the property to a new tenant for 1938 or 1939. He asked for a recovery in that respect, or at least, insisted that his right in that regard should not be impaired. We do not agree with this contention. After the Tysons left this property, Mr. Childress took it over and rented it for $4,000—$500 less than the amount the Tysons had agreed to pay. There is not one word of evidence to the effect that he assumed charge, rented or controlled the property for the account of the Tysons. The truth is he took charge

■■■■■■■■

for himself, rented for his own account and at that time provided in his new contract with the last tenant for a right to sell the land and terminate the new tenant's contract at the end of the first year; and he did, in fact, sell the property, as we understand, about the beginning of 1939. While there was a wrongful abandonment of the property by the Tysons, it amounted to a voluntary surrender, and acceptance by Mr. Childress.

The court was not in error in the cancellation of the lease contract and two unmatured notes, since such was the effect of the conduct of the parties which justified that part of the decree. 35 C. J., "Landlord & Tenant," § 265, see note 47; *Hayes* v. *Goldman,* 71 Ark. 251, 72 S. W. 563; *Williamson* v. *Crossett,* 62 Ark. 393, 36 S. W. 27.

In the state of the record as abstracted the court was correct in holding no damages shown on cross-appeal in the matter of the sale of the mules.

This case has been fully developed and we have decided to order and direct a decree. It will be, first for the amount of the note with interest as provided for to the date of the decree in the trial court. This decree is to be credited by the acreage shortage amounting to $420, balance on interest at contract rate; the recovery for the lumber amounting to $164; the recovery for transporting of labor $410 and the recovery for the expense of moving, $412.50, are set aside and the claims dismissed. Decree on the appellees' cross-appeal is affirmed. Since neither of the parties, appellant nor appellees, is free from fault, we have determined all costs should be divided and each party be required to pay one-half thereof.

It is so adjudged.